Jaymie Parkkinen (SBN 318394)
jparkkinen@taulersmith.com
Kiran Sekhon (SBN 360474)
ksekhon@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff*
*Claire de Roulhac*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAIRE DE ROULHAC, individually and on behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>        v.<br><br>CAREMETX, LLC, a Maryland limited liability company; and DOES 1 through 25, inclusive,<br><br>              Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1.  **VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)**<br><br>2.  **INTRUSION UPON SECLUSION**<br><br>3.  **UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.***<br><br>**<u>ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF</u>**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Claire de Roulhac ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows based on personal knowledge as to her own conduct and on information and belief as to all other matters:

## **INTRODUCTION**

1.     Defendant CareMetx, LLC ("Defendant") operates a commercial website, www.caremetx.com (the "Website"), that invites consumers to browse information about Defendant's healthcare services in California and throughout the United States. A typical visitor expects that the Website will respond to the visitor's requests by delivering content, but Defendant covertly configured the Website to do much more by embedding third-party tracking technology designed to identify visitors and convert their browsing activity into commercially useful intelligence.

2.     Those third parties are data brokers 6sense and LiveRamp (collectively, the "Data Brokers"). A "data broker" is a business that profits by collecting and combining consumer personal data across contexts and using it for commercial purposes, often outside the consumer's awareness or control.

3.     Defendant embedded each of the Data Brokers' anonymous visitor tracking programs (the "Tracking Beacons") on the Website. The Data Brokers market this technology as a way for businesses to identify visitors who do not submit forms or otherwise reveal their identity during a visit—i.e., visitors who wish to remain anonymous through ordinary web browsing.

4.     For example, as 6sense describes it, the point of the Tracking Beacons is to follow the "trail of breadcrumbs" left by browsing behavior and convert otherwise anonymous website traffic into actionable leads so businesses can understand who is visiting, prioritize outreach to them, and re-engage visitors through tailored follow-ups and targeted campaigns.

5.     Defendant did not deploy this technology to provide content or maintain basic website functionality, but to identify visitors and extract commercial value from their browsing activity by transmitting identifying signals off-site for matching and

downstream commercial exploitation.

6.     Defendant used that technology here. When Plaintiff, a California consumer, visited Defendant's Website, the embedded Tracking Beacons caused her browser to capture and transmit identifying signaling information associated with her visit to the Website. That signaling information was then used to recognize Plaintiff, turning an otherwise anonymous visit into a linkable record used for targeting and monetization.

7.     The California Invasion of Privacy Act ("CIPA") forbids this conduct. CIPA prohibits installing or using a "trap and trace device" without first obtaining consent or a court order. Cal. Penal Code § 638.51(a). A "trap and trace device" includes any "device or process" that captures the incoming impulses identifying the dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication. Cal. Penal Code § 638.50(c).

8.     By deploying the Tracking Beacons, Defendant turned ordinary browsing on the Website into a data-extraction and visitor-identification operation. Plaintiff brings this action on behalf of a class of California residents to enforce CIPA's prohibition on the use of trap and trace devices without consent, to remedy Defendant's related unfair competition under California's Unfair Competition Law, and to redress the common law invasion of privacy caused by Defendant's covert capture and off-site transmission of visitors' identifying information.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the proposed Class consists of 100 or more members, the amount in controversy exceeds $5,000,000, exclusive of costs and interest, and minimal diversity exists.

10.     This Court has general personal jurisdiction over Defendant because Defendant maintains hub offices in Oakland, California, and conducts substantial, continuous, and systematic business operations in California such that it is "essentially

3                                    CLASS ACTION COMPLAINT

at home" in this State. Defendant's California hub serves as a center for core corporate functions and Defendant derives significant and ongoing benefits from its California presence. Accordingly, Defendant is subject to general jurisdiction in California, and the exercise of jurisdiction comports with due process and traditional notions of fair play and substantial justice.

11. In addition, this Court has specific personal jurisdiction over Defendant because Defendant purposefully directed its conduct toward California by operating an interactive commercial Website to solicit and serve California consumers and by deriving substantial commercial benefit from California-based Website interactions. Defendant also implemented and maintained the Tracking Beacons on the Website to identify, profile, and monetize the activity of California residents, including Plaintiff. When Plaintiff accessed the Website from California, Defendant's tracking technologies collected routing information sufficient to recognize Plaintiff as a California user and then proceeded to capture and transmit Plaintiff's visitor-identifying information to the Data Brokers. Plaintiff's claims arise out of and relate to Defendant's forum-directed conduct, and the exercise of jurisdiction comports with due process and traditional notions of fair play and substantial justice.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's access to and use of the Website from this District and Defendant's collection, use, and transmission of Plaintiff's data in connection with that activity. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## **PARTIES**

13. Plaintiff Claire de Roulhac is an individual, citizen, and resident of California.

14. Defendant CareMetx, LLC is a limited liability company formed under

4                                   CLASS ACTION COMPLAINT

the laws of Maryland. Defendant maintains its principal place of business at 6931 Arlington Road, Suite 400, Bethesda, Maryland 20814, with hub offices in Oakland, California.

15. Plaintiff alleges the fictitiously named defendants captioned hereinabove as Does 1 through 25, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions, and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named defendants when they have been ascertained. For convenience, each reference herein to the named Defendant shall also refer to the Doe defendants.

## FACTUAL ALLEGATIONS

### A.    *The Tracking Beacon Extracts and Transmits Visitor-Identifying Data.*

16. The Website's Tracking Beacons do not simply facilitate the delivery of webpages. They are engineered to extract and transmit a visitor's identifying routing, addressing, and signaling information for a separate purpose: to enable third-party identity matching and monetization.

17. In ordinary browsing, certain technical exchanges occur so a browser can request and receive a page. But the identifying information at issue here is distinct. The Tracking Beacons deliberately capture and send *additional* visitor-identifying signals to third-party data brokers so the brokers can determine who the visitor is and link that visit to an identity profile. That extraction is not required to render the Website; it is implemented to create commercial value from Website visitors. The Tracking Beacons have no functional role in delivering website content; their sole purpose is to extract visitor-identifying signals for deanonymization and profiling.

18. The additional visitor-identifying signals captured by the Tracking Beacons include, without limitation, the addressing and routing data embedded in a

CLASS ACTION COMPLAINT

visitor's web requests and the Website's responses; data that functions as the communication's "to/from" and routing instructions that can be used to recognize and link a visitor's communications over time and across websites.

19.     In practical terms, the Tracking Beacons capture and transmit information such as: (i) the specific page and resource addresses the visitor requests from the Website (including paths and parameters identifying the content being requested); (ii) referrer and source fields showing how the visitor arrived at the Website and the prior page or channel that directed the request; (iii) browser- and device-signaling fields that describe the visitor's client environment (e.g., browser family and version, operating system family and version, language/locale settings, time zone, screen and rendering characteristics, and related client "fingerprint-like" attributes); and (iv) unique request and session identifiers and timestamps generated during the visit that allow multiple page requests to be grouped and attributed to the same source.

20.     This information is distinct from the substance of the pages a visitor seeks to view. It is the identifying signaling and routing data that makes the visit linkable (i.e., data "reasonably likely to identify the source" of the visitor's electronic communications). Defendant captures and transmits this information through the Tracking Beacons not to display the Website, but to enable the Data Brokers to recognize the visitor and associate the visit with an identity profile for targeting and monetization.

21.     The Website is used not only for general marketing, but for consumer decision-making about major healthcare decisions. A visitor's navigation of these pages can reveal private facts about the visitor's personal finances and healthcare needs. When those visitor-level signals are linked to an identity profile, they become attributable to a specific individual rather than an anonymous browser session. Indeed, the Data Brokers market that the value of these signals is that they can be used to determine *who* is behind the visit.

CLASS ACTION COMPLAINT

**B.** *The Data Brokers Use Captured Signals To Identify Visitors.*

22. The Data Brokers sell the Tracking Beacons, which comprise tracking technology designed to identify website visitors who do not submit forms, log in, or otherwise provide identifying information during a visit.

23. The Tracking Beacon operates in three steps:

a. **Capture.** *First*, when a webpage loads, the Tracking Beacons capture the incoming impulses and visitor-identifying headers and signals that reveal the source of the visitor's electronic communications with the Website, such as page/resource addresses requested, referrer/source fields, browser/device signaling fields, and session/request identifiers sufficient to distinguish the visitor and support identity matching.

b. **Transmit.** *Second*, the Tracking Beacons send that visitor-identifying information to the Data Brokers during the Website visit. This process enables recognition of the same visitor across pages and repeat visits by using identifiers stored in the visitor's browser.

c. **Match.** *Third*, the Data Brokers correlate the transmitted visit signals (such as referrer/source information and browser/device signals) with information in their own databases and other records to determine the likely identity of the visitor, and to associate the visit with an identity profile used for follow-on targeting.

24. Through this process, the Website visit is converted into a linkable record associated with a consumer identity profile that can be leveraged for targeting, measurement, and monetization beyond the Website itself.

25. During Plaintiff's visit to the Website on or around October 19, 2025, Defendant caused the Tracking Beacons to run on Plaintiff's device and to capture and transmit Plaintiff's visitor-identifying routing, addressing, and signaling information

CLASS ACTION COMPLAINT

to the Data Brokers. Defendant did not obtain informed, express consent for this practice and did not obtain a court order authorizing it.

## C. *The Exploitation of Visitors' Profiles.*

26. Once a visitor's data is linked to their broker-created identity profile, the visit can be used to enrich that profile and to support targeting far beyond the context of the Website visit. In this ecosystem, the value of the Tracking Beacons is their ability to identify the visitor and attach the visit to an identity record.

27. Data brokers openly market the ability to convert ordinary web activity into intimate, individualized profiles. Indeed, the CEO of the world's largest data broker recently bragged about the staggering extent to which data brokers secretly track internet users:

> [W]e know who she is, what she watches, what she reads, and who she lives with . . . Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. . . . We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation.[1]

28. The Data Brokers used Plaintiff's visitor-identifying data to associate Plaintiff's Website visit with an identity profile and to enrich that profile with information about Plaintiff's interaction with the Website. Defendant obtains commercial value from this arrangement, including by enabling audience building and targeted solicitation.

29. The consequences extend beyond advertising. Once visitor-identifying data is linked to a broker-maintained identity profile, the data becomes portable: it can be sold, licensed, queried, or otherwise disclosed to a wide range of third parties and repurposed outside the context in which it was collected.

---

[1] Lucas Ropek, *Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users*, March 15, 2025 (gizmodo.com).

CLASS ACTION COMPLAINT

30.     According to the Brennan Center for Justice:

Among the main purveyors in this surveillance capitalism ecosystem are data brokers—companies that collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell. . . . Myriad entities buy this information. For example, financial institutions and insurance firms use data for identity verification and risk assessments. Advertising companies use data to offer more relevant and targeted advertisements. More troublingly, data brokers have sold personal information to predatory loan companies, stalkers, and scammers, as well as to political consultants . . . that can use data to send voters disinformation and attempt to skew electoral outcomes. Data brokers also sell data to foreign actors whose uses of the information are not constrained by U.S. law. And . . . law enforcement and other government agencies (including state and local law enforcement, the FBI, the IRS, the Drug Enforcement Administration, the Department of Defense, and the Department of Homeland Security) have secretly been paying data brokers to access vast databases of personal information, including geolocation data, without any warrant, court order, or even subpoena.[2]

31.     The foreseeable risk created by Defendant's conduct is therefore not abstract: by converting Plaintiff's Website visit into a linkable identity profile and exporting it into the broker ecosystem without consent, Defendant created an enduring data linkage that can be exploited long after Plaintiff's Website visit ends and far beyond the purpose for which Plaintiff accessed the Website.

32.     Defendant's conduct has caused, and continues to cause, injury to Plaintiff, and other similarly situated visitors, in concrete ways; Plaintiff's communications with the Website were converted into a linkable identity profile without Plaintiff's consent; Plaintiff lost control over how the extracted visitor-identifying data is used and disseminated; and Plaintiff faces an ongoing risk that this unlawfully created identity profile will be repurposed, shared, or sold within the data broker ecosystem for uses far removed from Plaintiff's purpose in visiting the Website.

---

[2] Emile Ayoub and Elizabeth Goitein, *Closing the Data Broker Loophole*, February 13, 2024 (brennancenter.org).

CLASS ACTION COMPLAINT

33. Defendant's deployment of the Tracking Beacons intentionally interfered with Plaintiff's private affairs in a manner a reasonable person would find highly offensive. It took what should have been an ephemeral website visit and disclosed the visitor's identifying information to third-party data brokers for deanonymization and cross-context exploitation. The disclosure to the Data Brokers itself, made without consent and for identity matching and monetization, constitutes a concrete invasion of privacy because it attributes personal browsing activity to a visitor's identity profile and exports it outside the consumer-website relationship.

## CLASS ACTION ALLEGATIONS

34. **Class Definition.** Plaintiff brings this action as a class action on behalf of herself and all others similarly situated as members of the "Class" defined as follows:

> **All persons in California whose visitor-identifying routing, addressing, or signaling information was captured as a result of visiting the Website without first obtaining their affirmative, express consent during the applicable limitations period.**

35. Excluded from the Class are: (i) Defendant and its parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; (ii) Defendant's officers and directors; (iii) the Court, the Court's staff, and any judicial officer assigned to this case and members of their immediate families; and (iv) any person who timely and validly opts out of the Class.

36. Plaintiff reserves the right to amend the Class definition as discovery and the Court's rulings warrant.

37. **Rule 23 Reference.** Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

38. **Numerosity.** The Class is so numerous that joinder is impracticable. The Website is a widely used consumer website. The Tracking Beacons operated during Website visits and applied in the same manner to California visitors. Class members are therefore readily in the thousands, if not more, and can be identified through objective criteria, including Website visit records and data flows to the Data Brokers.

10                                    CLASS ACTION COMPLAINT

39.    **Commonality.** Common questions of law and fact exist, including:

    a.    Whether Defendant deployed the Tracking Beacons on its Website;

    b.    Whether the Tracking Beacons captured and transmitted visitor-identifying routing, addressing, and signaling information from Californians visiting the Website;

    c.    Whether Defendant installed or used a trap and trace device or process within the meaning of Cal. Penal Code § 638.50(c);

    d.    Whether Defendant obtained consent and/or a court order required by Cal. Penal Code § 638.51;

    e.    Whether Defendant's covert deployment of the Tracking Beacons to identify visitors and transmit their identifying information to third-party data brokers constituted an intrusion upon seclusion under California law;

    f.    Whether Defendant's conduct constituted unlawful and/or unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and

    g.    The proper measure of statutory damages and the scope of injunctive relief.

40.    **Predominance.** Common issues predominate. Defendant's deployment of the Tracking Beacons was uniform, and the key issues are capable of resolution using common proof, including Defendant's Website implementation, technical logs, vendor documentation, and the Data Brokers' records. Individualized inquiries are not necessary to determine liability because the challenged conduct is the same for all Class members.

41.    **Typicality.** Plaintiff's claims are typical of the Class because Plaintiff, like every Class member, visited the Website from California and was subjected to the same uniform practice: the Tracking Beacons' capture and transmission of visitor-identifying routing, addressing, and signaling information.

    CLASS ACTION COMPLAINT

42.    **Superiority.** A class action is superior to other methods of adjudication. The statutory damages available for each Class member are not likely to support individual litigation, and resolving these claims in a single proceeding will conserve judicial resources, avoid inconsistent outcomes, and provide an efficient mechanism for relief.

43.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests align with those of the Class, and Plaintiff has retained counsel with experience litigating privacy and class actions. Plaintiff has no interests antagonistic to the Class.

44.    **Injunctive Relief.** Defendant has acted on grounds generally applicable to the Class by deploying the Tracking Beacons in a uniform manner on the Website. Plaintiff therefore seeks final injunctive and declaratory relief appropriate to the Class as a whole, including an order prohibiting Defendant from capturing and transmitting visitor-identifying routing, addressing, and signaling information via the Tracking Beacons without the consent and/or court order required by California law.

45.    **Notice.** Plaintiff will propose and submit to the Court a plan for providing the best notice practicable under the circumstances to Class members, including individual notice to the extent Class members can be identified through reasonable effort, and will request that such notice be provided consistent with Fed. R. Civ. P. 23 and due process.

## COUNT I: VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW, CAL. PENAL CODE § 638.51

### (*On Behalf of Plaintiff and the Class*)

46.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

47.    CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to

CLASS ACTION COMPLAINT

identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

48.    CIPA prohibits any person from installing or using a trap and trace device without first obtaining consent or a court order. Cal. Penal Code § 638.51(a).

49.    Defendant installed and used the Tracking Beacons on the Website. The Tracking Beacons are "device[s] or process[es]" within the meaning of § 638.50(c) because they operate during Website visits to capture incoming electronic impulses and extract visitor-identifying routing, addressing, and signaling information.

50.    As alleged herein, the Tracking Beacons capture and transmit, among other things, addressing and routing information, referrer and source fields, browser- and device-signaling fields, and unique request and session identifiers and timestamps—information reasonably likely to identify the source of a visitor's electronic communications.

51.    The Tracking Beacons are deployed for the purpose of enabling the Data Brokers to recognize the same visitor across multiple communications and to associate the visitor's Website activity with an identity profile used for targeting and monetization.

52.    Defendant installed and used the Tracking Beacons without first obtaining a court order authorizing the installation or use of a trap and trace device or process.

53.    On or around October 19, 2025, Plaintiff visited the Website from California. During Plaintiff's visit, Defendant caused the Tracking Beacons to run on Plaintiff's device and to capture and transmit Plaintiff's visitor-identifying routing, addressing, and signaling information to the Data Brokers.

54.    Defendant deployed the Tracking Beacons in the same manner for other California visitors to the Website during the class period, causing the same capture and transmission of visitor-identifying routing, addressing, and signaling information.

55.    Plaintiff did not provide express, informed consent to Defendant's installation or use of the Tracking Beacons, including Defendant's capture and

CLASS ACTION COMPLAINT

transmission of Plaintiff's visitor-identifying routing, addressing, and signaling information to the Data Brokers for identity matching and monetization. Defendant likewise did not obtain express, informed consent from other Class members.

56. By installing and using the Tracking Beacons without the consent and/or court order required by CIPA, Defendant violated Cal. Penal Code § 638.51.

57. Plaintiff and members of the Class suffered injury because Defendant captured and transmitted their visitor-identifying routing, addressing, and signaling information without consent. That capture and third-party disclosure for identity matching is a concrete invasion of privacy because it interferes with visitors' private affairs and discloses their visitor-identifying information to data brokers for deanonymization and cross-site profiling—conduct a reasonable person would find highly offensive when imposed without consent.

58. Pursuant to Cal. Penal Code § 637.2, Plaintiff and the Class seek statutory damages and such other relief as the Court deems proper for Defendant's installation and use of a trap and trace device or process without the consent and/or court order required by law. Plaintiff also seeks declaratory and injunctive relief appropriate on a classwide basis under Rule 23(b)(2) to prohibit Defendant's continued deployment and use of the Tracking Beacons as alleged herein and to require appropriate remedial measures, including deletion and cessation of retention of information captured or received through the Tracking Beacons and commercially reasonable steps to direct Defendant's service providers to do the same to the extent practicable.

## COUNT II: INTRUSION UPON SECLUSION
### (*On Behalf of Plaintiff and the Class*)

59. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

60. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner

CLASS ACTION COMPLAINT

that would be highly offensive to a reasonable person.

61.     Defendant intentionally implemented and deployed the Tracking Beacons on the Website. The Tracking Beacons were not incidental or inadvertent; they were purposefully embedded and configured to run when visitors accessed the Website.

62.     By means of the Tracking Beacons, Defendant intruded into Plaintiff and the Class members' private affairs by capturing and transmitting information associated with their Website visits, including visitor-identifying routing, addressing, and signaling information and visit-level interaction data, and sending that information to third-party data brokers for visitor recognition, matching, and downstream commercial exploitation.

63.     Plaintiff and the Class members had a reasonable expectation of privacy in the fact and manner of their browsing activity on the Website and in not having an otherwise anonymous visit converted into a linkable identity profile and conveyed off-site to third parties for identification, targeting, and exploitation.

64.     Defendant's intrusion would be highly offensive to a reasonable person. Defendant used a consumer-facing Website as the intake point for a visitor-identification process that operates in the background, without meaningful disclosure and without informed, express consent, to deanonymize visitors and export their identifying information to data brokers for commercial purposes. This practice is not necessary to deliver the webpages a consumer requests and instead serves to convert a visitor's activity into an exploitable identity profile.

65.     Plaintiff did not authorize Defendant to deploy third-party visitor-identification mechanisms on her device or to transmit her visitor-identifying information and visit data to data brokers for recognition, matching, targeting, or monetization. The Class members likewise did not authorize such conduct.

66.     Defendant's conduct was willful, intentional, and carried out with conscious disregard for the privacy rights of Website visitors. Defendant knowingly embedded and maintained third-party visitor-identification technology designed to

CLASS ACTION COMPLAINT

deanonymize visitors and transmit their identifying information off-site for commercial use, while failing to provide meaningful disclosure or obtain informed, express consent. Defendant's conduct therefore constituted malice, oppression, and/or fraud within the meaning of Cal. Civ. Code § 3294, warranting an award of punitive damages.

67.    As a direct and proximate result of Defendant's intrusion, Plaintiff and the Class members suffered harm, including invasion of privacy, loss of control over their personal information, and the creation and dissemination of a linkable identity profile of their browsing activity outside the consumer-website relationship.

68.    Plaintiff seeks all available relief, including damages on behalf of the Class, as well as injunctive and declaratory relief appropriate on a classwide basis under Rule 23(b)(2) to enjoin Defendant's uniform Tracking Beacon practices alleged herein and to require appropriate remediation, including deletion and cessation of retention of information collected or received as a result of those practices and commercially reasonable steps to direct Defendant's service providers to do the same to the extent practicable.

## COUNT III: UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE §§ 17200 *et seq.*

### (*On Behalf of Plaintiff and the Class*)

69.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

70.    Defendant's conduct—embedding and using the Tracking Beacons on the Website to capture and transmit visitors' identifying information and thereby convert ordinary browsing into linkable identity profiles—constitutes unfair competition.

71.    Defendant's conduct is unlawful because it violates, and is independently actionable under, California's privacy laws, including without limitation CIPA's prohibition on installing or using a trap and trace device or process without the required consent or court order. Cal. Penal Code §§ 638.50-638.51.

CLASS ACTION COMPLAINT

72. Defendant's deployment of the Tracking Beacons, and the resulting capture and transmission of identifying information associated with Website visits, is precisely the type of covert identification mechanism CIPA's trap and trace provision was enacted to prevent. Defendant did not obtain the consent or court authorization the statute requires.

73. By engaging in this unlawful conduct in the course of operating a commercial website aimed at California consumers, Defendant committed business acts and practices that are unlawful within the meaning of Cal. Bus. & Prof. Code §§ 17200 *et seq.*

74. Defendant's conduct is also unfair. A reasonable consumer visiting the Website expects that a browser will request and receive content. A reasonable consumer does not expect that the visit will be covertly used to identify the visitor, associate the visit with an identity profile, and transmit visitor-identifying information to third-party data brokers for downstream targeting and monetization.

75. The injury to consumers is substantial. Defendant's configuration of the Website caused visitors to lose the practical anonymity that ordinary web browsing provides and to have their visits converted into trackable records associated with identifying information without consent.

76. Those harms are not outweighed by countervailing benefits to consumers or competition. Any operational analytics or website functionality can be accomplished without covert third-party identification and deanonymization and without transmitting visitors' identifying information to data brokers.

77. The injury was not reasonably avoidable because the relevant tracking and identification occurred automatically in the background during the visit, without disclosure sufficient to permit informed choice.

78. Plaintiff has suffered injury in fact and lost money or property as a result of Defendant's unfair competition. Browsing and visit-level data has economic value, and there is an established market for such data; Defendant's covert collection and

transfer of visitors' data impaired consumers' ability to control, withhold, or monetize that value. Defendant's surreptitious collection and transfer of that data inhibited Plaintiff and Class members' ability to participate in that market on informed terms, including by deciding whether to withhold, limit, or exchange that data for value.

79.    In addition, Plaintiff and the Class members possess protectable interests in their personal information, including legally recognized rights to exclude or limit sale and downstream use of that data; Defendant's undisclosed transfer of data to data brokers diminished those interests and interfered with consumers' ability to exercise those rights.

80.    Defendant obtained money or property from Plaintiff and the Class members by acquiring, using, and exploiting the value of their visit data and identifying information without permission, and by obtaining the benefit of enhanced visitor identification and targeting capabilities without paying for that value.

81.    All such conduct is unethical, immoral, substantially injurious to consumers, and/or violates public policy.

82.    As a direct and proximate result of Defendant's conduct, acts, and omissions, Plaintiff and the Class members have suffered injuries in fact and lost money or property, including by being deprived of the ability to control, withhold, or otherwise realize the economic value of their visit data and identifying information that Defendant caused to be transmitted to data brokers for commercial use. Plaintiff seeks restitution and other equitable relief available under Cal. Bus. & Prof. Code § 17203 on behalf of Plaintiff and the Class, and further seeks injunctive and declaratory relief under § 17203 directed at Defendant's uniform Tracking Beacon practices, appropriate on a classwide basis under Rule 23(b)(2), including orders prohibiting the challenged practices and requiring appropriate remedial measures, along with prejudgment interest and attorneys' fees and costs as provided in Cal. Code Civ. Proc. § 1021.5.

/ / /

CLASS ACTION COMPLAINT

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief:

1.      Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

2.      Declare that Defendant's conduct as alleged herein violates Cal. Penal Code §§ 638.50(c) and 638.51;

3.      Declare that Defendant's conduct as alleged herein constitutes intrusion upon seclusion under California common law;

4.      Declare that Defendant's conduct as alleged herein constitutes unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

5.      Issue appropriate declaratory and injunctive relief directed at Defendant's uniform Tracking Beacon practices, including orders requiring Defendant to delete and cease retaining visitor-identifying routing, addressing, and signaling information captured or received through the Tracking Beacons, and to take commercially reasonable steps to direct its service providers, including the Data Brokers, to do the same to the extent Defendant has the right or ability to do so;

6.      Award statutory damages to Plaintiff and the Class pursuant to Cal. Penal Code § 637.2;

7.      Award Plaintiff and the Class general and special damages in an amount to be proven at trial for Defendant's intrusion upon seclusion;

8.      Award injunctive relief requiring Defendant to cease installing and/or using the Tracking Beacons or any trap and trace device or process on the Website without lawful consent and/or the court order required by Cal. Penal Code § 638.51, and requiring such further injunctive relief as the Court deems just and proper;

9.      Award punitive and exemplary damages to the extent permitted by law;

10. Award restitution and such other equitable relief as the Court deems proper under Cal. Bus. & Prof. Code § 17203, including disgorgement of ill-gotten gains to the extent permitted;

11. Award Plaintiff and the Class their reasonable attorneys' fees and costs to the extent permitted by law;

12. Award pre-judgment and post-judgment interest as permitted by law; and

13. Grant such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury for all issues triable to a jury.


DATED: January 30, 2026                    TAULER SMITH LLP

                                           */s/ Jaymie Parkkinen*
                                           Jaymie Parkkinen

                                           *Attorneys for Plaintiff*
                                           *Claire de Roulhac*

CLASS ACTION COMPLAINT